IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

SHELLY M. KELLENBARGAR                                              PLAINTIFF

V.                                      NO. 08-5252

MICHAEL J. ASTRUE,
Commissioner of Social Security                                     DEFENDANT

**MEMORANDUM OPINION**

Plaintiff, Shelly M. Kellenbargar, brings this action pursuant to 42 U.S.C. §405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner), denying her claims for disability and disability insurance benefits under Title II of the Social Security Act (the Act) and Supplemental Security Income under Title XVI of the Act. In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. See 42 U.S.C. §405(g).

**Procedural Background**

Plaintiff originally applied for disability insurance benefits as well as supplemental security income on March 8, 2006. (Tr. 86-88, 525-527). These claims were denied initially and upon reconsideration. (Tr. 63-64, 65-66, 70-72, 528-529,-532-533, 534-535). A hearing before Administrative Law Judge Edward Starr (ALJ) was held on these claims on March 13, 2008. (Tr. 43-62). On July 24, 2008, the ALJ issued an unfavorable decision, (Tr. 8-10) and on September 23, 2008, the Appeals Council denied Plaintiff's request for review. (Tr. 3-5).

In his decision, and after careful consideration of the entire record, the ALJ made the following findings:

- The Plaintiff met the insured status requirements of the Act through March 31, 2010;

- The Plaintiff had not engaged in substantial gainful activity since June 2, 2005, the alleged onset date;

- The Plaintiff had the following severe impairments: bipolar disorder and asthma;

- The Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1;

- The Plaintiff had the RFC to occasionally lift 20 pounds and frequently lift 10 pounds. She can push/pull within these same limitations. She can sit for 6 hours and can stand/walk for 6 hours. She must avoid concentrated exposure to pulmonary irritants. She is moderately limited in the ability to understand, remember, and carry out complex instructions, respond appropriately to usual work situations and routine work changes, and interact appropriately with supervisors and co-workers. Moderately limited means there is more than a slight limitation but the person can still perform in a satisfactory manner.

(Tr. 13-14).

Plaintiff raises two issues in this appeal: the ALJ erred in failing to consider all of Plaintiff's impairments in combination; and the ALJ erred in finding that Plaintiff retained the residual functional capacity (RFC) to perform light work.

**Evidence Presented**

At the hearing held before the ALJ, Plaintiff initially testified that the conditions that limited her ability to work were bipolar disorder, asthma and hearing loss. (Tr. 46). Plaintiff's attorney thereafter stated that the issues regarding disability had to do with Plaintiff's mental illness and that the non-psychological or psychiatric issues were not disabling. (Tr. 48).

From 1999 to 2003, Plaintiff presented herself on several occasions to health care providers, complaining of depression. (Tr. 159-161,162, 169, 170, 175, 443-336, 523-524). Plaintiff moved from Colorado to Arkansas in 2004, and began going to Ozark Guidance Center for therapy. (Tr. 410-412). On September 22, 2005, Plaintiff saw Dr. David L. Beeman for a persistent cough. (Tr. 313). Dr. Beeman noted that Plaintiff continued to smoke a half pack of cigarettes a day "even though she has a history of asthma." (Tr. 313). He concluded that Plaintiff had bronchitis with bronchospasm with underlying asthma, and advised Plaintiff that she needed to quit smoking or she would have continued cough and congestion. (Tr. 313).

On October 8, 2005, Plaintiff saw Dr. Beeman again and, although Plaintiff was doing better, she continued to smoke. (Tr. 312). Plaintiff told Dr. Beeman that she was having difficulty with her bipolar disorder and that she felt depressed, but denied being suicidal or homicidal. (Tr. 312). Once again, Dr. Beeman advised Plaintiff to quit smoking, to follow up with her psychiatrist at Ozark Guidance Center, and started her on Lithium. (Tr. 312). On November 3, 2005, Plaintiff saw Dr. Beeman with a four day history of having sinus/ear congestion and chest congestion. (Tr. 309). She continued to smoke, but stated that her wheezing was resolved. Dr. Beeman advised Plaintiff again that she needed to quit smoking. (Tr. 309).

On February 20, 2006, Plaintiff presented herself again to Dr. Beeman, with a two week history of having sinus/ear congestion, chest congestion and cough productive of green mucous. (Tr. 308). Dr. Beeman noted that Plaintiff continued to smoke and reiterated to her that she would continue to have recurrent problems because she continued to smoke. (Tr. 308).

Plaintiff went to the Ozark Guidance Center on March 7, 2006, where she reported that she was diagnosed with bipolar disorder in Colorado in 2003, while hospitalized for a serious suicide

attempt, and said that she had not been on medication since the fall of 2003. (Tr. 405). Plaintiff stated that her nine year old daughter was living with her again, and she wanted desperately to stay healthy in order to care for her. (Tr. 405). Plaintiff was "miserable" with her life and complained of daily headaches. (Tr. 405). Plaintiff had not yet begun to take the Lithium that had been prescribed for her, and reported that she was extremely sensitive to medications. (Tr. 405). She also stated that she could not afford the medications, but also that she did not like feeling numb and having no feelings at all while on the medication. (Tr. 405). Plaintiff admitted that she had not remained on medication consistently because she did not like the way it made her feel, but was willing to try medication at that time. (Tr. 406). She stated that she did not use drugs at all. (Tr. 407). A week later, on March 14, 2006, Tiffany McCullough, of the Ozark Guidance Center, stated that she was concerned about Plaintiff's emotional well being if her daughter should leave, but that Plaintiff had no suicidal or homicidal ideation at that time. (Tr. 402). It was also noted that Plaintiff was then taking medications as prescribed and was not able to sustain substantial gainful employment at that time. (Tr. 403).

A Field Office Disability Report dated March 21, 2006, via teleclaim with Plaintiff, reflected that Plaintiff had no difficulty hearing, reading, breathing, understanding, concentrating, talking and answering, and that Plaintiff was nice and cooperative. (Tr. 101). On that same date, notes from the Ozark Guidance Center reflected that Plaintiff was waiting to see Dr. Salvador before taking the Lithium and that she was not taking medications as prescribed. (Tr. 399-400).

On March 28, 2006, records from the Ozark Guidance Emergency services indicated that Plaintiff was suicidal and was referred to Vista Health. (Tr. 198). The Vista Health Admission Record indicated that the principal diagnosis was bipolar II disorder and secondary diagnosis was

personality disorder, not otherwise specified (NOS), surgical menopause, asthma, and headache. (Tr. 179-180). Plaintiff reported that she had planned to kill herself the previous day, to slit her wrist. (Tr. 190-191). She also reported that she had not eaten in several days and smoked marijuana two times a week. (Tr. 190-191). Plaintiff made an audio tape recorder for her friends and family to make arrangements after she died, but did not follow through because her dog would not leave her alone. (Tr. 201). Plaintiff's daughter left a few days earlier to live with her father and Plaintiff was therefore resentful and stressed out. Plaintiff reported homicidal ideations weekly toward her sister, but did not want to act on them because she did not want to go to jail. (Tr. 201). Plaintiff stated that two months earlier, she and her sister "tried to kick each others asses" and her sister tried to kill her. (Tr. 207). It was also noted that Plaintiff had minimal difficulty with hearing. (Tr. 217).

Dr. Lewis Britton, the attending psychiatrist at Vista Health, performed a psychiatric evaluation on Plaintiff on March 29, 2006. (Tr. 218-220). He also completed a history and physical exam. (Tr. 225-234). Dr. Britton noted that Plaintiff smoked two joints per week to make her headaches better and smoked one pack of cigarettes per day (Tr. 225). He found her to be a well-developed, well-nourished individual who did not appear to be acutely or chronically ill. He found her hearing to be adequate for normal conversation and that she heard finger rubbing and snapping equally in both ears. (Tr. 226, 227, 232). His clinical impression/diagnosis was mood disorder, NOS; marijuana dependence, asthma, headaches and menopause medical. (Tr. 234).

A Discharge Summary prepared by Dr. Britton on April 6, 2006, noted that Plaintiff tested positive for cannabis. (Tr. 181). Dr. Britton reported that Plaintiff's condition gradually improved throughout her hospital stay and that she presented more cheerful and spontaneous. She also denied

suicidality and homicidality. (Tr. 182). She desired discharge and was to return to Ozark Guidance Center for follow up care. (Tr. 182). Dr. Britton's final diagnosis was:

- Axis I: Bipolar II disorder depressed severe without psychotic features. Obsessive compulsive disorder.

- Axis II: Personality disorder not otherwise specified.

- Axis III: Surgical menopause. Asthma. Headaches.

- Axis IV: Problems with primary support group. Housing problems. Economic problems.

- Axis V: GAF 55 highest level in past year. GAF 15 on admission. GAF 45 on discharge.

(Tr. 183). Dr. Britton's prognosis was: "Good if compliant with treatment." (Tr. 183).

Records from the Ozark Guidance Center dated April 14, 2006, indicated that Plaintiff was happy and was on new medications and taking as prescribed. (Tr. 396-397). In a Function Report dated April 28, 2006, Plaintiff reported that she took care of her daughter, fixed her meals, went to ball games, and helped her daughter with her homework, all with help. (Tr. 112). She also stated that she did laundry, swept & mopped, cleaned obsessively when not depressed, feared going out alone, went to her daughter's ball games on a regular basis, could lift 20 pounds, walk 50 feet before resting, stand for 10 minutes and had severe hearing loss. (Tr. 117).

On May 25, 2006, Dr. Beeman saw Plaintiff, who stated that she was doing well. She continued to have migraine headaches but they were "not the worst of her life." (Tr. 304). On June 1, 2006, Dr. Beeman again advised Plaintiff to quit smoking, noting that Plaintiff continued to have migraine headaches and that Imitrex was not helping. (Tr. 301,302). He reported that Plaintiff smoked one half pack per day and denied alcohol use. (Tr. 302).

A head CT was performed on Plaintiff on June 5, 2006, because of her migraines. (Tr. 300). The impression was "unremarkable pre-and post contrast CT of the head." (Tr. 300). In a letter dated June 6, 2006, from Dr. Kejian Tang to Dr. Beeman, who referred Plaintiff to him for her headaches, Dr. Tang concluded that with Plaintiff's symptoms and signs, "I suspect possible tension type headache, although migraine cannot be totally ruled out." (Tr. 314-315). Dr. Tang was going to let Plaintiff try Amitriptyline and would re-evaluate her in two months. (Tr. 315). There is no evidence in the record that Plaintiff went back to Dr. Tang.

On June 9, 2006, a Mental RFC Assessment was completed by medical consultant, Dr. Jay Rankin. (Tr. 384-387). He found Plaintiff to be:

- Moderately limited in her ability to: carry out detailed instructions; maintain attention and concentration for extended periods; sustain an ordinary routine without special supervision without being distracted by them; complete a normal work-day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in the work setting; set realistic goals or make plans independently of others.

- Not Significantly Limited in her ability to: remember locations and work-like procedures; understand and remember very short and simple instructions; understand and remember detailed instructions; carry out very short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; make simple work-related decisions; interact appropriately with the public; ask simple questions or request assistance; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; be aware of normal hazards and take appropriate precaution; travel in unfamiliar places or use public transportation.

(Tr. 386). Dr. Rankin also found that Plaintiff was able to perform work where interpersonal contact is incidental to work performed, e.g. assembly work; where the complexity of tasks is learned and

performed by rote, with few variables and little judgment; and where supervision required is simple, direct and concrete. (Tr. 386).

A Physical RFC Assessment was completed on June 9, 2006, by medical consultant Steve Owen. (Tr. 415-422). He found that Plaintiff was able to: occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk about 6 hours in an 8 hour workday, sit about 6 hours in an 8-hour workday, and had unlimited ability to push and/or pull. (Tr. 416). He also concluded that no postural, manipulative, visual or communicative limitations were established and that Plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation. (Tr. 417, 419).

On August 9, 2006, the Ozark Guidance Center reported that Plaintiff was doing much better, with no adverse side effects of her medication. (Tr. 390). No psychosis, depression, mania, suicidal or homicidal ideation were noted. (Tr. 390). At that time, Plaintiff's medications were Depakote ER, Lexapro, Klonopin and Ambien CR. (Tr. 390).

On September 13, 2006, Dr. Ester Salvador, an Ozark Guidance Staff Psychiatrist, reported that Plaintiff stated she was doing well on her medications with no side effects. (Tr. 388). She also stated that Plaintiff went to live with her mother but that her mother did not believe there was anything wrong with her. She noted no psychosis, suicidal or homicidal ideation. (Tr. 388). Plaintiff's medications were then reported as Depakote ER and Lexapro. (Tr. 388). The Ozark Guidance Center continued to report that Plaintiff was doing well on medications, with no side effects, on November 16, 2006. (Tr. 382). Nevertheless, on January 12, 2007, in her request for a hearing, Plaintiff alleged that she was "unable to work because of Bipolar disorder, anxiety disorder,

panic attacks, OCD and severe headaches related to stress, tension & anxiety; numerous suicide attempts." (Tr. 38).

On February 20, 2007, Plaintiff was taken to Northwest Medical Center by her sister who stated that Plaintiff was acting goofy with a decreased level of consciousness. (Tr. 429). Plaintiff had told her sister she wanted to kill herself - her husband of four months had filed for divorce that day and she wanted to die. (Tr. 429). Dr. Wendy David noted that Plaintiff was not cooperative, appeared to be a danger to herself, and had been drinking alcohol that evening. (Tr. 429). Dr. David also noted that Plaintiff smoked at least a pack of cigarettes a day and drank alcohol and the impression was Tricyclic overdose and possible Depakote overdose. (Tr. 431). Dr. David believed Plaintiff was going to need inpatient treatment because she had a lot of problems with depression over the past several months that had not been getting treated with outpatient therapy, and she did not believe Plaintiff could be trusted with medications. (Tr. 431). The next day, Plaintiff left the medical center against medical advice and signed a release, releasing the doctor, hospital and hospital employees from all responsibility for all ill effects which might result from the action. (Tr. 450).

A Mental Diagnostic Evaluation was conducted by Jeanne H. Curtis, Psy.D., on November 8, 2007. (Tr. 481-486). It was noted that Plaintiff still smoked marijuana one to two times a week when she could afford it or had access to it through friends. (Tr. 483). Plaintiff reported suicidal ideation with a plan and questionable intent, and violent ideation "when my sister makes me mad," with no plan or intent. The diagnosis was: Axis I: Bipolar Disorder; Panic Disorder with Agoraphobia and Obsessive-Compulsive Disorder; Axis II - 799.9 and Axis V: GAF - 45-55. (Tr. 484). It was found that Plaintiff demonstrated the capacity to speak in an intelligible and effective

manner, had the ability to cope with the typical mental/cognitive demands of basic work like tasks, involving cleaning, but that Plaintiff became bored with other tasks. (Tr. 485).

Dr. Curtis found that Plaintiff had the moderate ability to make judgments on simple work-related decisions, understand and remember complex instructions, and carry out complex instructions, and had a marked ability to make judgment on complex work-related decisions. She further stated that "Mood variables such as distractibility during manic episodes and depressed mood, loss of interest, psychomotor retardation during depressed episodes would affect these abilities, as well as panic symptoms." Dr. Curtis also found that Plaintiff had the mild ability to interact appropriately with the public, supervisors and co-workers and a marked ability to respond appropriately to usual work situations and to changes in a routine work setting. "Panic symptoms in a work setting and/or mood disturbance would affect her interaction and response to changes in routine work setting." Dr. Curtis opined that "Getting to and staying at a job site would be difficult, if not impossible, based on panic and mood symptoms" and that intermittent marijuana use was not assessed to contribute substantially to her current impairments. (Tr. 488).

Plaintiff's work history indicates that she has not held down a job for any substantial length of time. All of her jobs ended either because she was fired or she just quit. (Tr. 49). She testified that she could sit for days and just read a book. (Tr. 50). When she had her manic episodes, she cleaned obsessively and did not sleep and would stay manic for a week or two. (Tr. 50). She stated that she was not able to work during manic episodes because she was sporadic with anything she did. (P. 50). Plaintiff testified that when she completed four classes at college, she had three A's and a B, and was able to do that because she went to the therapist and could do most of her work at home.

(Tr. 53). She stated that she lived on money that she received from taxes and from a settlement from her last divorce, but did not have much left. (Tr. 60).

  The ALJ submitted Interrogatories to Vocational Expert (VE), Dale Thomas. (Tr. 153-155).

In his first hypothetical, the ALJ stated:

> Please assume a hypothetical person of the claimant's age at the alleged onset date, which is 30 years old, with 12 years education and the same work history. This person can occasionally lift 20 pounds and frequently 10. She can push/pull within these same limitations. She can sit for 6 hours and can stand, walk for 6 hours. She must avoid concentrated exposure to pulmonary irritants. This person is moderately limited in the ability to understand, remember, and carry out complex instructions, respond appropriately to usual work situations and routine work changes, and interact appropriately with supervisors and co-workers. Moderately limited means there is more than a slight limitation but the person can still perform in a satisfactory manner.
>
> Assume there is no past relevant work to which the person can return and that transferable skills are not an issue. Are there jobs in the national and regional economy this person can do? If so, please list examples, three if possible, along with DOT identification, and relevant numbers in the state and national economies.

(Tr. 154-155).

In response to the first hypothetical, the VE answered: Production worker, maid and cashier. (Tr. 155).

The ALJ propounded a second hypothetical:

> Please change the limitations as follows: The physical limitations in the first hypothetical question continue to apply. The mental limitations are different. This person's ability to appropriately interact with supervisors, co-workers, and the public is only mildly limited. This person's ability to appropriately respond to usual work situations and routine work changes is markedly limited. Mildly limited means there is a slight limitation but the person functions generally well. A marked limitation is a serious limitation resulting in a substantial loss of ability. With these limitations, would there be jobs? If so, please give examples, three if possible, and relevant numbers.
>
> In response to the second hypothetical, the VE answered: There would be no jobs. (Tr. 155).

**Applicable Law**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Ramirez v. Barnhart, 292 F. 3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. Edwards v. Barnhart, 314 F. 3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. Young v. Apfel, 221 F. 3d 1065, 1068 (8th Cir. 2000).

It is well established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F. 3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§423(d)(3), 1382(3)(D). A plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant had engaged in substantial gainful activity since filing her claim; (2) whether the claimant had a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) met or equaled an impairment in the listings; (4) whether the impairment(s) prevented the claimant from doing past relevant work; and, (5) whether the claimant was able to perform other work in the national economy given her age, education, and experience. See 20 C.F.R. §416.920. Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of her residual functional capacity (RFC). See McCoy v. Schwieker, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §416.920.

**Discussion**

The ALJ found that Plaintiff had severe impairments of bipolar disorder and asthma. (Tr. 13). With respect to the long term headaches, the ALJ found that even Plaintiff said they were not the worst of her life and that results of the head CT scan were normal. (Tr. 13). Furthermore, there was no evidence that Plaintiff returned to Dr. Tang, who believed Plaintiff's headaches to be tension type headaches. (Tr. 13). With respect to hearing loss, the ALJ found that there was no mention of hearing loss in the record or that the impairment restricted the Plaintiff's capacity for work activity. (Tr. 13). An Ozark Guidance Center record indicated that Plaintiff had <u>minimal</u> difficulty hearing, (emphasis added) (Tr. 217) and Dr. Britton reported that Plaintiff's hearing was adequate for normal conversation. (Tr. 226). All of these facts indicate that there is substantial evidence in the record as a whole that neither Plaintiff's alleged headaches nor hearing loss constituted severe impairments for purposes of the Act.

With respect to Plaintiff's asthma, there is substantial evidence to support the fact that Plaintiff totally disregarded numerous medical recommendations to quit smoking, in spite of the fact that Dr. Beeman advised her that she would continue to suffer from chest congestion and coughing if she continued to smoke. In fact, in 2007, she was reported as smoking a pack of cigarettes a day and smoking marijuana 1-2 times a week. The ALJ may consider Plaintiff's failure to stop smoking in making his credibility determination in this case, where Plaintiff continued to smoke one half to a pack a day and 1-2 marijuana cigarettes per week. In this case, there is no dispute that smoking had a direct impact on Plaintiff's asthma and Plaintiff was continuously told to quit smoking. Mouser v. Astrue, 545 F.3d 634, 638 (8th Cir. 2008)(Medical records reflect that smoking likely caused Mouser's COPC, and his continued smoking amounts to a failure to follow a prescribed course of remedial treatment). Thus, the ALJ appropriately considered Plaintiff's failure to stop smoking when making his credibility determination.

With respect to Plaintiff's bipolar disorder, the ALJ found that the record showed the Plaintiff stabilized mentally when Plaintiff was compliant with medications and reported no adverse side effects to those medications. (Tr. 16). He further found that the objective medical evidence of record did not support Plaintiff's allegations of a disabling mental impairment that would limit activities beyond the scope of the RFC as determined in his decision. (Tr. 17).

In Pratt v. Sullivan, 956 F.2d 830 (8th Cir. 1992), the Court addressed the sequential process for evaluating mental impairments as set out in 20 C.F.R. §404.1520a.

> The first step is to record pertinent signs, symptoms, and findings to determine if a mental impairment exists. Id. §404.1520a(b)(1). These are gleaned from a mental status exam or psychiatric history, id., and must be established by medical evidence consisting of signs, symptoms, and laboratory findings. See id. §404.1508. If a mental impairment is found, as

>   it should have been in this case, (footnote omitted) the ALJ must then analyze whether certain medical findings relevant to ability to work are present or absent. Id. §404.1520(b)(2).
>
>   The procedure then requires the ALJ to rate the degree of functional loss resulting from the impairment in four areas of function which are deemed essential to work. Id. §404.1520a(b)(3). Those areas are: activities of daily living; social functioning; concentration, persistence or pace; and deterioration or decompensation in work or work-like settings. Id. ... After rating the degree of functional loss, the ALJ is to determine the severity of the mental impairments with reference to the ratings. Id. §404.1520a©). If the mental impairment is severe, then the ALJ must determine whether it meets or equals a listed mental disorder. Id. §404.1520a(c)(2) (footnote omitted). ...If the claimant has a severe impairment, but the impairment neither meets or equals the listing, then the ALJ is to do a residual functional capacity assessment. (Footnote omitted). See id. §404.1520a(c)(3).

Id. at 834-35.

The ALJ found that although Plaintiff had a severe impairment of bipolar disorder and asthma, she did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. He then found that Plaintiff had the RFC to perform certain jobs. The ALJ has a duty to fully and fairly develop the record, and it is incumbent upon the ALJ to establish by medical evidence that the claimant had the requisite RFC and to question a claimant in detail about her abilities. Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence," Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000), we have also stated that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). The record should "include some medical evidence that supports the ALJ's residual functional capacity finding." Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam). The ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace." Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000). In evaluating a claimant's RFC, the ALJ is not limited to considering medical evidence, but is required to consider at least some supporting evidence from a

professional. See 20 C.F.R. §404.1545©); cf. Ford v. Secretary of Health and Human Services, 662 F. Supp. 954, 955-956 (W.D. Ark. 1987) (RFC was "medical question," and medical evidence was required to establish how claimant's heart attacks affected his RFC.) (cited with approval in Nevland, 204 F. 3d at 858); Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir. 2003). The ALJ's duty is to determine a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own description of his or her limitations. Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004); Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005).

The ALJ found that Plaintiff had the RFC to perform the requirements of representative occupations such as production worker, maid and cashier, based upon the information provided by the VE. He further stated that he did not discount all of Plaintiff's complaints and recognized that she did experience limitations. However, given the objective medical evidence in the record, the ALJ found that the Plaintiff's RFC was reasonable, and that Plaintiff could function within those limitations without experiencing significant exacerbation of her symptoms.

The court is of the opinion that the ALJ failed to properly address Dr. Curtis's opinion that Plaintiff had a marked ability to make judgment on complex work-related decisions or that mood variables during manic episodes and depressed mood, loss of interest, psychomotor retardation during depressed episodes would affect these abilities. The ALJ also failed to specifically address Dr. Curtis's finding that Plaintiff had a marked ability to respond appropriately to usual work situations and to changes in a routine work setting. Dr. Curtis concluded that getting Plaintiff to and staying at a job site would be difficult, if not impossible, based upon panic and mood symptoms. Upon remand, the ALJ should specifically address these specific findings by Dr. Curtis.

In addition, the Court is also concerned that when the ALJ presented the VE with a hypothetical to assume Plaintiff's ability to appropriately respond to usual work situations and routine work changes was markedly limited, the VE stated that there would be no jobs. This conclusion, coupled with Dr. Curtis's findings, leads the court to conclude that this matter should be remanded in order for the ALJ to more specifically address Dr. Curtis's findings and to obtain another consultative exam, focusing on Plaintiff's Mental RFC, and to reassess Plaintiff's RFC in light of the additional information.

**Conclusion**

Based on the foregoing, the undersigned reverses the decision of the ALJ and remands this case to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. §405(g). DATED this 7th day of December, 2009.

/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE